UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
GMA ACCESSORIES, INC.

                Plaintiff,

- against -

EPARTNERS, INC.

                Defendant.
------------------------------------------------------X

**AMENDED COMPLAINT**

Civil Action No.: 07 CV 8414 (LAK)

RECEIVED OCT 11 2007 U.S.D.C. S.D.N.Y. CASHIERS

Plaintiff, GMA Accessories, Inc., (hereinafter "GMA"), brings this amended complaint against Defendant ePartners, Inc. (hereinafter "ePartners"), alleging upon information and belief as follows:

### NATURE OF THE CASE

GMA entered various agreements with the defendant for the purpose of upgrading and installing a state of the art computer system for GMA's wholesale fashion business. After GMA paid ePartners substantial amounts in reliance upon the contracts and ePartners' promises, it was left with an abandoned project and the loss of substantial resources, not only in the out of pocket expenses but in loss of countless hours of executive and management resources dedicated to the ePartners' initiative as well as the substantial set back in GMA's business due to ePartners' willful breach of contract, and misrepresentations that were both negligent and fraudulent.

### PARTIES

1. Plaintiff, GMA, is a corporation duly organized and existing under the laws of the State of New York, with its principal place of business at 1 East 33rd Street, New York, New York.

Case 1:07-cv-08414-LAK-THK    Document 21-2    Filed 12/12/2007    Page 2 of 15

2. GMA is a citizen of the state of New York and is not a citizen of the state of Texas.

3. "CAPELLI" is an assumed name of GMA, also with its principal place of business at 1 East 33rd Street, New York, New York.

4. Defendant ePartners is a corporation duly organized and existing under the laws of the State of Texas, with its principal place of business located at 6565 N. MacArthur Blvd., Suite 950, Irving, TX, 75039.

5. ePartners is a citizen of the state of Texas and is not a citizen of the state of New York.

## JURISDICTION AND VENUE

6. Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1332 as the plaintiff is a citizen of a different state than defendant and the amount in controversy exclusive of interest and costs exceeds $75,000.00.

7. Venue is proper under 28 U.S.C. Sec. 1391 (b), and (c) and Sec. 1400 (a).

8. GMA is a citizen of the state of New York and is not a citizen of the state of Texas.

9. ePartners is a citizen of the state of Texas and is not a citizen of the state of New York.

## FACTUAL ALLEGATIONS

10. On or about November 2003, GMA contacted ePartners because it wanted to obtain a state of the art computer system for its fashion accessory wholesale business.

11. On or about December 2, 2003, ePartners sent information about ePartners to GMA.

12. GMA informed ePartners of its need to upgrade its existing system, and to have a fully operational system and platform no later than March 31, 2006.

13. On or about December 15, 2003, ePartners proposed to GMA the "Axapta" system as part of the solution for GMA's needs.

14. On or about March 21, 2004, ePartners invited GMA to Orlando, Florida to showcase the "Axapta" system.

15. ePartners followed-up this meeting by creating a proposal for a solution which was pitched to GMA on May 21, 2004.

16. On or about June 17, 2004, ePartners conducted a presentation of the proposed solution in GMA's New Jersey Office.

17. On or about September 2, 2004, ePartners conducted a presentation of its final proof of concept solution demo to department managers at GMA.

18. GMA stressed the need for the program to integrate with its fashion accessories.

19. On or about March 15, 2005, ePartners held a presentation of the ePartners' program in New York City.

20. On March 31, 2005, GMA and ePartners signed a product order (the "Product Order").

21. The Product Order provided that ePartners would provide software, products, and modules to GMA.

22. On June 8, 2005, ePartners and GMA entered into a Master Services Agreement (hereinafter the "June 8 Master Services Agreement"). See Exhibit A hereto.

23. Under the June 8 Master Services Agreement, ePartners was to provide services to GMA, including among other things the creation and completion of a project that would result in the implementation of a fully operational system and platform for GMA.

24. On June 8, 2005, GMA and ePartners entered into a Master Service Order (hereinafter the "June 8 Master Service Order"). See Exhibit B hereto.

25. The June 8 Master Service Order sets forth, among other things, the operating procedures, payment terms, and functionality of the system ePartners was to provide to

GMA. Annexed to the June 8 Master Service Order is a summary of the functions of the system (Exhibit C) and a description of some of the services ePartners claimed the system would perform. (Exhibit D).

26. On June 27, 2005, ePartners purported to outline the GMA project, summarized the project approach, timeframes, roles and responsibilities of those involved in the project, and a communication plan. See Exhibit E hereto.

27. On or about June 27, 2005, Jon Lee, Engagement Manager of ePartners, assured Elie Saliba, Vice President of GMA's Information Systems, that ePartners would have the fully operational system and platform, up and running for GMA no later than March 31, 2006. Id.

28. According to ePartners the project was to begin August 16, 2005.

29. ePartners held its first project meeting on September 22, 2005 at GMA's New York Offices.

30. On September 27, 2005, ePartners and GMA finalized the payment terms in a document entitled "Master Service Order – GMA – 002 Addendum A" (hereinafter "Addendum A").

31. All four agreements, the Product Order; the June 8 Master Services Agreement; the June 8 Master Services Order; and Addendum A are collectively referred to herein as the "AGREEMENTS."

32. Section 7.1 of the June 8 Master Service Order and Addendum A specified, among other things, that ePartners was required to timely provide project status reports to GMA, to assign adequate resources to the projects, to prepare appropriate project documentation, to reasonably prepare project plans, and to reasonably carry out other project tasks.

4

33. Section 7.6 of the June 8 Master Services Order and Addendum A specified that ePartners was obligated to replace any unsatisfactory ePartners personnel within two weeks, and to use commercially reasonable efforts to replace resources and personnel.

34. Section 5.2 of the June 8 Master Services Agreement specified that ePartners was obligated to perform services "in a good and workmanlike manner and in accordance with the specifications" of the project and orders from GMA.

35. Section 5.2 of the June 8 Master Service Order specified that ePartners was obligated to configure and implement the software modules set forth in the product orders from GMA.

36. Pursuant to Section 5.2.4 of the June 8 Master Service Order, ePartners was obligated to "Identify the Functional Requirements, develop the Detailed Design, Develop, and Test various customizations or complex configurations to the software. Those identified include the following: Pending Purchases Order; Freight/Duty and OOCL Interface; Bulk Orders and Confirmations; Single store vs. multi-store based on destination; Depleting Bulk Orders; Pack Items – piece and quantity; Bill of Lading; Download CIT Chargeback; Upload P/O Info to Cargo; Range Pack capability; and UPC / SKU auto generate."

37. Pursuant to Section 5.2.5 of the June 8 Master Service Order, "ePartners will provide assistance to [GMA's] technical resources." ePartners was responsible for assisting "in data mapping and synchronization (import/export) processes and procedures" as well as providing "technical information" regarding the products identified in Product Order.

38. Pursuant to Section 5.2.6 of the June 8 Master Service Order, ePartners was to "configure and implement Production capability for domestic operations located in New Jersey." ePartners was also required to "perform Discovery work related to international

operations such that proper configurations decisions [would be] made to support the future roll-out (Phase 2) of the system to off-shore production locations."

39. Pursuant to Section 5.2.7 of the June 8 Master Service Order, ePartners and its designees were to "provide three (3) vendor mappings and training to the [GMA] team to develop additional mappings."

40. Pursuant to Section 7.11 of the June 8 Master Service Order, ePartners was obligated to hire a Subject Matter Expert "to both support the GMA project and to assist in the penetration of the Fashion and Apparel market," as well as another employee of GMA's choosing as an additional member of the GMA team.

41. ePartners failed to carry out many of its obligations including but not limited to those set forth herein, and thus committed material breaches of the Agreements.

42. On October 27, 2005, another project meeting took place at GMA's New York Offices.

43. GMA informed ePartners at least as early as January 2006, that ePartners (a) did not timely provide project status reports to GMA; (b) did not assign adequate resources to the projects, (c) did not prepare appropriate project documentation; (d) did not reasonably or adequately prepare project plans; (e) failed to reasonably carry out project tasks; (f) did not timely replace unsatisfactory ePartners personnel; (g) did not perform its services in a good or workmanlike manner, or in accordance with the specifications of the project and orders from GMA; and (h) did not correctly configure or implement the software modules set forth in the product orders.

44. GMA sent ePartners written complaints concerning the failure of ePartners to comply with its obligations, and repeatedly informed ePartners of how these failures were

harming GMA's business. For example, in January 2006, GMA sent ePartners a list of ePartners' failure to comply with its obligations.

45. GMA repeatedly informed ePartners that ePartners was failing to meet its obligations under the Agreements, and that as a result the project was failing.

46. On or about January 24, 2006, ePartners acknowledged the problems and belatedly proposed new personnel and other anecdotes as possible solutions to the problems. See Exhibit F hereto.

47. ePartners continued its breach by failing to follow through with the solutions that ePartners itself proposed.

48. In March 2006, ePartners' project manager and senior consultant resigned from both the project and ePartners.

49. In May 2006, the Executive Vice President of ePartners, who was also a key person to the project, himself resigned from ePartners.

50. By at least as early as May 2006, ePartners was fully aware that it was nowhere near fulfilling its promises to implement AXAPTA or any system for GMA by March 31, 2006.

51. Though GMA made all payments set forth in the September 27, 2005 agreement, during the summer of 2006 it found itself with a project that was failed and ePartners' promises to cure its breach also failed.

52. ePartners' failure to implement a fully operational system for GMA resulted in disruption of and damage to GMA's business, which ePartners was aware relies on a fully operational information system.

53. GMA made payments to ePartners in an amount totaling $843,000.

54. Despite the fact that GMA had performed its obligations under the Agreements, ePartners failed to perform its obligations under the Agreements.

55. GMA also incurred incidental costs and damages in the amount of at least $500,000.

56. In light of ePartners' failure to perform its contractual obligations, GMA demanded that ePartners return to GMA the amounts that GMA had paid to ePartners, and the additional costs and damages that GMA had incurred as a result of ePartners' failure to carry out its contractual obligations. ePartners refused each and every one of GMA's demands.

## COUNT I – (Breach Of Contract)

57. Plaintiff repeats and realleges paragraphs 1 through 56 as though fully set forth at length herein.

58. The Agreements are valid and binding contracts between GMA and ePartners.

59. GMA fully performed its obligations under the Agreements.

60. ePartners breached the Agreements as set forth above, not only depriving GMA of the benefit bargained for, but causing GMA damage to its business and other consequential damages.

61. As a result of ePartners' breach of the Agreements, GMA suffered damages in an amount no less than the $843,000 it paid to ePartners for services and product that ePartners never performed or delivered, and additional costs and damages in an amount of approximately $500,000 for a total of $1,343,000.

## COUNT II – (Breach Of Implied Warranty Of Good And Workmanlike Performance)

62. Plaintiff repeats and realleges paragraphs 1 through 61 as though fully set forth at length herein.

63. In carrying out its services and work for GMA, ePartners was obligated to carry out its services and work in accordance with the implied warranty of good and workmanlike performance.

64. ePartners failed to carry out its services and work for GMA in a good and workmanlike manner. As set forth below, ePartners failed to carry out many steps that were necessary in order to implement a fully operational system for GMA.

65. GMA performed all of its express and implied obligations, yet received no benefit from ePartners.

66. As a result of ePartners' breach of the implied warranty of good and workmanlike performance, GMA suffered damages in an amount no less than the $843,000 it paid to ePartners for services and product that ePartners never performed or delivered, and additional costs and damages in an amount of approximately $500,000.

## COUNT III – (Breach Of Duty Of Good Faith And Fair Dealing)

67. Plaintiff repeats and realleges paragraphs 1 through 66 as though fully set forth at length herein.

68. ePartners' conduct had the effect of destroying or injuring the rights of GMA to receive the fruits of the agreements, which plaintiff has not benefited by whatsoever.

69. ePartners had a duty of good faith and fair dealing to GMA.

70. ePartners breached its duty of good faith and fair dealing to GMA.

71. As a result of ePartners' breach of its duty of good faith and fair dealing, GMA suffered damages in an amount no less than the $843,000 it paid to ePartners for services and product that ePartners never performed or delivered, and additional costs and damages in an amount of approximately $500,000.

## COUNT IV – (Unjust Enrichment)

72. Plaintiff repeats and realleges paragraphs 1 through 71 as though fully set forth at length herein.

73. Defendant received money from GMA without providing a benefit to GMA

74. Defendant was unjustly enriched.

75. The enrichment was at the plaintiff's expense

76. The circumstances are such that in equity and good conscience the defendant should return the money it received from plaintiff.

77. ePartners has been unjustly enriched in an amount no less than the $843,000.

## COUNT V – (Negligent Misrepresentation)

78. Plaintiff repeats and realleges paragraphs 1 through 77 as though fully set forth at length herein.

79. Defendant made negligent misrepresentations to plaintiff.

80. The misrepresentation occurred in a close relationship between plaintiff and defendant.

81. There was actual privity of contract between the plaintiff and defendant.

82. On June 27, 2005 ePartners by Jon Lee promised among other things that: (a) Axapta would be implemented by March 31, 2006 utilizing out of the box with core

10

functionality as required; (b) the Business Process Verification and Validation (VnV), Infrastructure Analysis and the Project Management activities would begin during the Origination Phase of the project; (c) during VnV, key team members of the GMA Unified Project Team (SuperUsers) would be trained to understand the fundamentals of the Axapta application; and that (d) certain project timeframes would be met. See Exhibit F hereto.

83. On January 24, 2006, ePartners by Eric Forgo represented among other things (a) "that Axapta is precisely the right ERP platform to support your business"; (b) "ePartners is continuing work exclusively on system Design and remains confident that Axapta will meet system requirements"; (c) "Axapta Practice Management will complete a monthly project quality assurance review." See Exhibit G.

84. All of the aforementioned representations and others were material.

85. All of the aforementioned representations and others were unfulfilled, false and misleading.

86. The representations of ePartners were false and ePartners acted negligently, recklessly and intentionally when it made them.

87. ePartners failed to exercise reasonable care or competence in obtaining or communicating this information to GMA.

88. It was justifiable for GMA to rely upon ePartners' representations in GMA's decisions to enter into the agreements; to make payments to ePartners; and to allocate resources to the project.

89. In foreseeable reliance upon ePartners' negligent misrepresentations, GMA entered into the agreements with ePartners; made payments to ePartners; and devoted substantial resources including manpower and monies to ePartners.

90. GMA suffered damages in an amount no less than the $843,000 and additional costs and damages in an amount of approximately $500,000.

### COUNT VI – (Fraud)

91. Plaintiff repeats and realleges paragraphs 1 through 90 as though fully set forth at length herein.

92. Defendants committed fraud, including fraud in the inducement

93. Upon information and belief, defendant made these aforementioned material misrepresentations and others for the purpose of inducing the plaintiff to rely on them.

94. On December 15, 2003 and March 21, 2004 ePartners proposed to GMA the "Axapta" system as part of the solution for GMA's needs.  ePartners created a proposal for a solution which was pitched to GMA on May 21, 2004, June 17, 2004 and September 2, 2004.

95. On June 27, 2005 ePartners purported to outline the GMA project, summarized the project approach, timeframes, roles and responsibilities of those involved in the project, and a communication date.

96. On or about June 27, 2005, Jon Lee, Engagement Manager of ePartners, assured Elie Saliba, Vice President of Information Systems, at GMA that ePartners would have the Axapta system, as well as a full operational system and platform, up and running for GMA no later than March 31, 2006.

97. On January 24, 2006 ePartners Vice President Lee provided assurances to GMA Vice President Elie Saliba that the problems would be corrected.

98. Plaintiff forseeably relied upon these misrepresentations and others in contracting and making payments with and to defendant.

99. Plaintiff forseeably relied upon these misrepresentations in continuing to make payments and incurring other costs and damages.

100. At all times relevant hereto, Plaintiff was ignorant of the falsity of the misrepresentations.

101. Upon information and belief defendant knew that its representations to GMA were false.

102. As a result of ePartners' fraud and fraud in the inducement, GMA suffered damages in an amount no less than the $843,000 it paid to ePartners for services and product that ePartners never performed or delivered, and additional costs and damages in an amount of approximately $500,000.

**WHEREFORE**, PLAINTIFF prays:

    A. That this Court adjudge that the Defendant breached the Agreements.

    B. That Defendant return $843,000 to Plaintiff

    C. That Defendant reimburse GMA $500,000 in incidental damages.

    D. That Plaintiff recover from defendant punitive and exemplary damages in an amount to be determined at trial over and above the damages set forth in B and C.

    E. That GMA recover pre-judgment and post-judgment interest on each and every award.

F. That GMA recover its reasonable attorney fees incurred in this action.

G. That GMA have and recover its taxable costs and disbursements incurred in this action.

H. That GMA have such other and further relief as the Court may deem just and proper.

### JURY DEMAND

GMA respectfully requests a trial by jury as to all issues.

Dated: New York, New York
October 9, 2007

Respectfully Submitted,

THE BOSTANY LAW FIRM

By: _____
ANDREW T. SWEENEY (AS-0724)
Attorney for Plaintiff GMA Accessories, Inc.
40 Wall Street, 61st Floor
New York, New York 10005
(212) 530-4400

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
GMA ACCESSORIES, INC.

              Plaintiff,

- against -

EPARTNERS, INC.

              Defendant.
------------------------------------------------------X

**AFFIRMATION OF SERVICE**

Civil Action No.: 07cv8414 (LAK)

STATE OF NEW YORK    )
                              ) ss.:
COUNTY OF NEW YORK )

        Andrew T. Sweeney, an attorney duly licensed to practice in the state of New York, hereby affirms under penalty of perjury: deponent is not a party to the action, is over 18 years of age and works at 40 Wall Street, New York, New York 10005. On October 10, 2007, deponent served the AMENDED COMPLAINT dated October 10, 2007 with EXHIBITS upon:

| Attorney(s) | Address | Party |
|---|---|---|
| Anthony H. Lowenberg, Esq.<br>Hermes Sargent Bates, LLP | 901 Main Street, Suite 5200<br>Dallas, Texas 75202 | ePartners, Inc. |

the said address(es) designed by said attorney(s) for that purpose by depositing the same enclosed in a post-paid, properly addressed wrapper, in an official depository under the exclusive care and custody of the United States Postal Service within the State of New York.

                                                                                   Andrew T. Sweeney

New York, New York
October 10, 2007