UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
GMA ACCESSORIES, INC.

                Plaintiff,                <u>EFC CASE</u>

                                           Civil Action No.: 07 CV 8414 (LAK)

- against -

EPARTNERS, INC.

                Defendant.
-----------------------------------------------------------X

**PLAINTIFF'S RESPONSE TO
DEFENDANT'S FIRST REQUEST FOR ADMISSIONS**

Plaintiff, GMA ACCESSORIES, INC. ("GMA"), by and through its attorneys, THE BOSTANY LAW FIRM, for its Response to Defendant's First Request for Admissions pursuant to Fed.R.Civ.P. 36, responds as follows:

| | |
|---|---|
| Response to Request No. 1: | Admitted |
| Response to Request No. 2: | Denied |
| Response to Request No. 3: | Denied |
| Response to Request No. 4: | Denied |
| Response to Request No. 5: | Denied |
| Response to Request No. 6: | Denied |
| Response to Request No. 7: | Denied |
| Response to Request No. 8: | Denied |
| Response to Request No. 9: | Admitted |
| Response to Request No. 10: | Admitted |
| Response to Request No. 11: | Admitted |
| Response to Request No. 12: | Admitted |
| Response to Request No. 13: | Admitted |
| Response to Request No: 14: | Denied |
| Response to Request No. 15: | Denied |
| Response to Request No. 16: | Admitted |

ResponseGMAReq.Admit05.21.08

EXHIBIT B

| | |
|---|---|
| Response to Request No. 17: | Admitted |
| Response to Request No. 18: | Admitted |
| Response to Request No. 19: | Admitted |
| Response to Request No. 20: | Admitted |
| Response to Request No. 21: | Denied |
| Response to Request No. 22: | Admitted |
| Response to Request No. 23: | Admitted |
| Response to Request No. 24: | Admitted |
| Response to Request No. 25: | Admitted |
| Response to Request No. 26: | Admitted |
| Response to Request No. 27: | Admitted |
| Response to Request No. 28: | Admitted |
| Response to Request No. 29: | Admitted |
| Response to Request No. 30: | Denied |
| Response to Request No. 31: | Admitted |
| Response to Request No. 32: | Admitted |
| Response to Request No. 33: | Admitted |
| Response to Request No. 34: | Admitted |
| Response to Request No. 35: | Admitted |
| Response to Request No. 36: | Admitted |
| Response to Request No. 37: | Admitted |
| Response to Request No. 38: | Admitted |
| Response to Request No. 39: | Admitted |
| Response to Request No. 40: | Admitted |
| Response to Requests No. 41: | Objection: Not likely to lead to admissible evidence |
| Response to Request No. 42: | Objection: Not likely to lead to admissible evidence |
| Response to Request No. 43: | Objection: Not likely to lead to admissible evidence |
| Response to Request No. 44: | Objection: Not likely to lead to admissible evidence |
| Response to Request No. 45: | Objection: Not likely to lead to admissible evidence |
| Response to Request No. 46: | Objection: Not likely to lead to admissible evidence |
| Response to Request No. 47: | Objection: Not likely to lead to admissible evidence |

| | |
|---|---|
| Response to Request No. 48: | Objection: Not likely to lead to admissible evidence |
| Response to Request No. 49: | Objection: Not likely to lead to admissible evidence |
| Response to Request No. 50: | Objection: Not likely to lead to admissible evidence |
| Response to Request No. 51: | Objection: Not likely to lead to admissible evidence |
| Response to Request No. 52: | Objection: Not likely to lead to admissible evidence |
| Response to Request No. 53: | Objection: Not likely to lead to admissible evidence |
| Response to Request No. 54: | Objection: Not likely to lead to admissible evidence |
| Response to Request No. 55: | Objection: Not likely to lead to admissible evidence |
| Response to Request No. 56: | Objection: Not likely to lead to admissible evidence |
| Response to Request No. 57: | Objection: Not likely to lead to admissible evidence |
| Response to Request No. 58: | Objection: Not likely to lead to admissible evidence |
| Response to Request No. 59: | Objection: Vague and ambiguous |
| Response to Request No. 60: | Admitted |
| Response to Request No. 61: | Admitted |
| Response to Request No. 62: | Denied |
| Response to Request No. 63: | Admitted |
| Response to Request No. 64: | Denied |
| Response to Request No. 65: | Admitted |
| Response to Request No. 66: | Denied |
| Response to Request No. 67: | Admitted |
| Response to Request No. 68: | Denied |
| Response to Request No. 69: | Admitted |
| Response to Request No. 70: | Denied |
| Response to Request No. 71: | Admitted |
| Response to Request No. 72: | Denied |
| Response to Request No. 73: | Admitted |
| Response to Request No. 74: | Denied |
| Response to Request No. 75: | Admitted |
| Response to Request No. 76: | Denied |
| Response to Request No. 77: | Admitted |
| Response to Request No. 78: | Denied |

| | |
|---|---|
| Response to Request No. 79: | Admitted |
| Response to Request No. 80: | Denied |
| Response to Request No. 81: | Admitted |
| Response to Request No. 82: | Denied (?) |
| Response to Request No. 83: | Admitted |
| Response to Request No. 84: | Objection: Vague and ambiguous; not likely to lead to admissible evidence |
| Response to Request No. 85: | Objection: Vague and ambiguous; not likely to lead to admissible evidence |
| Response to Request No. 86: | Objection: Vague and ambiguous; not likely to lead to admissible evidence |
| Response to Request No. 87: | Admitted |
| Response to Request No. 88: | Objection: Vague and ambiguous; not likely to lead to admissible evidence |
| Response to Request No. 89: | Objection: Vague and ambiguous; not likely to lead to admissible evidence |
| Response to Request No. 90: | Objection: Vague and ambiguous; not likely to lead to admissible evidence |
| Response to Request No. 91: | Denied |
| Response to Request No. 92: | Denied |
| Response to Request No. 93: | Objection: Vague and ambiguous; not likely to lead to admissible evidence |
| Response to Request No. 94: | Objection: Vague and ambiguous; not likely to lead to admissible evidence |
| Response to Request No. 95: | Objection: Vague and ambiguous; not likely to lead to admissible evidence |
| Response to Request No. 96: | Denied |
| Response to Request No. 97: | Objection: Vague and ambiguous; not likely to lead to admissible evidence |
| Response to Request No. 98: | Objection: Vague and ambiguous; not likely to lead to admissible evidence |

Response to Request No. 99:     Denied

Response to Request No. 100:    Deny knowledge necessary to respond.

Response to Request No. 101:    Deny knowledge necessary to respond.

Response to Request No. 102:    Denied

Response to Request No. 103:    Denied

Dated: May 21, 2008

The Bostany Law Firm<br>
Attorneys for Plaintiff<br>
<br>
By: _____<br>
Ronald L Paltrowitz, Of Counsel<br>
40 Wall Street, 61st Floor<br>
New York, New York 10005<br>
(212) 530-4400

## CERTIFICATE OF SERVICE

Under penalty of perjury, the undersigned certifies that on the 22 day of May 2008, a true copy of the foregoing document was forwarded in accordance with the Federal Rules of Civil Procedure and Local Rules of the Southern District of New York to the following counsel of record for the Defendant ePartners, Inc.:

Amy E. Davis, Esq.
Peter Brown, Esq.

_____
Daniel A. Levy

HERMES SARGENT BATES, LLP
Amy E. Davis, *pro hac vice*
Anthony H. Lowenberg, *pro hac vice*
901 Main Street, Suite 5200
Dallas, Texas 75202
(214) 749-6000

THELEN REID BROWN
RAYSMAN & STEINER LLP
Peter Brown
W. Shamiso Kristen-Faith Maswoswe
875 Third Avenue
New York, New York 10022
(212) 603-2000

Attorneys for Defendant ePartners Incorporated

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X
GMA ACCESSORIES, INC.,                    :   ECF CASE
                                          :
                                          :   No. 07 CV 8414 (LAK)
                        Plaintiff,        :
                                          :   DEFENDANT'S FIRST REQUEST
      - against -                         :   FOR ADMISSIONS TO PLAINTIFF
                                          :
EPARTNERS, INC.                           :
                        Defendant.        :
                                          :
------------------------------------------------------- X

Pursuant to Federal Rule of Civil Procedure 36, Defendant, ePartners Incorporated ("ePartners"), by and through its attorneys, Thelen Reid Brown Raysman & Steiner LLP and Hermes Sargent Bates, LLP, makes its First Request for Admissions to Plaintiff GMA Accessories, Inc. ("GMA") and requests that Plaintiff respond to the Request for Admissions.

## DEFINITIONS:

1. "Project" means the subject matter of, and the work performed by, the Parties pursuant to the series of agreements made the basis of the present lawsuit.

2. "Plaintiff," "you," or "GMA" means GMA Accessories, Inc., the Plaintiff in the present lawsuit, and its successors, predecessors, divisions, subsidiaries, present and former officers, agents, employees, and all other persons acting on behalf of it or its successors, predecessors, divisions, and subsidiaries.

3. "Defendants" or "ePartners" means ePartners Incorporated, the Defendant in the present lawsuit, and its successors, predecessors, divisions, subsidiaries, present and former officers, agents, employees, and all other persons acting on behalf of it or its successors, predecessors, divisions, and subsidiaries.

4. The "Lawsuit" means the present lawsuit, Civil Action No. 07cv8414, *GMA Accessories, Inc. v. ePartners, Inc.*, pending in the United States District Court, Southern District of New York.

5. "Agreements" means the contracts and agreements made the basis of the present lawsuit between the parties concerning the Project, including, but not limited to, the Joint Marketing Agreement, the Master Service Order, the Service Orders, the Master Services Agreement, and all addendums thereto.

6. "Product Order" means the Product Order made the basis of the present lawsuit between the parties concerning the Project dated March 31, 2005, and all terms and conditions and addendums thereto.

7. "Master Services Agreement" means the Master Services Agreement made the basis of the present lawsuit between the parties concerning the Project dated June 8, 2005, and all terms and conditions and addendums thereto.

8. "Joint Marketing Agreement" means the Joint Marketing Agreement made the basis of the present lawsuit between the parties concerning the Project dated June 8, 2005, and all terms and conditions and addendums thereto.

9. "Master Service Order" means the Master Service Order made the basis of the present lawsuit between the parties concerning the Project dated June 8, 2005, and all terms and conditions and addendums thereto.

10. "Service Orders" mean all service orders executed by the parties with respect to the Project, including but not limited to the Service Order dated December 3, 2004, and all terms and conditions and addendums thereto.

11. "MBS" means Microsoft Business Solutions.

12. "Software partner(s)" means any software consulting firm that provides services the same as or similar to the services ePartners was to perform for the Project.

13. The use of the singular form of any word includes the plural and vice versa

### REQUESTS:

**REQUEST NO. 1:** Admit that GMA conducted independent due diligence regarding possible software solutions, prior to the execution of the Product Order between ePartners and GMA.

**REQUEST NO. 2:** Admit that GMA considered other software partners, MBS or otherwise, in the selection process leading up to the Agreements with ePartners, and what was represented to Ken Eldridge, Erik Sevenants and Dan Duffy on this topic when negotiating the terms of the Agreements.

**REQUEST NO. 3:** Admit that GMA traveled to, or otherwise met with, an MBS partner in Australia prior to executing the Agreements.

**REQUEST NO. 4:** Admit that GMA traveled to, or otherwise met with, MBS partners.

**REQUEST NO. 5:** Admit that GMA traveled to, or otherwise met with, BMI.

**REQUEST NO. 6:** Admit that GMA traveled to, or otherwise met with, Tectura.

**REQUEST NO. 7:** Admit that GMA traveled to, or otherwise met with, Columbus IT.

**REQUEST NO. 8:** Admit that GMA traveled to, or otherwise met with, MBS Axapta and New England-based partners.

**REQUEST NO. 9:** Admit that GMA understood that, prior to the execution of the Agreements, off-the-shelf software was not available at that time that offered same or similar solutions for the fashion and fashion accessory industry that was offered by the existing software, Aria.

**REQUEST NO. 10:** Admit that GMA understood (prior to the execution of the Agreements) that Axapta was one of several possible off-the-shelf software programs that could be customized to provide the same or similar solutions for the fashion and fashion accessory industry that was offered by the existing software, Aria.

**REQUEST NO. 11:** Admit that GMA partnered with ePartners to customize the Axapta software to provide the same or similar solutions for the fashion and fashion accessory industry offered by the existing software, Aria.

**REQUEST NO. 12:** Admit that GMA understood (prior to the execution of the Agreements) that Axapta was a relatively new software product for which there were few senior Axapta technicians in the United States.

**REQUEST NO. 13:** Admit that GMA understood (prior to the execution of the Agreements) that Axapta was a relatively new software product for which there were few senior Axapta project managers in the United States.

**REQUEST NO. 14:** Admit that GMA understood (prior to the execution of the Agreements) that Axapta was a relatively new software product, which made difficult the hiring and retention of senior Axapta technicians in the United States.

**REQUEST NO. 15:** Admit that GMA understood (prior to the execution of the Agreements) that Axapta was a relatively new software product, which made difficult the hiring and retention of senior Axapta project managers in the United States.

**REQUEST NO. 16:** Admit that GMA initially retained ePartners to perform a business analysis to identify its business processes and software system requirements before selecting a software solution.

**REQUEST NO. 17:** Admit that GMA understood (prior to the execution of the Agreements) that ePartners had limited experience in the fashion and fashion accessory industry.

**REQUEST NO. 18:** Admit that GMA understood (prior to the execution of the Agreements) that ePartners had limited knowledge of the fashion and fashion accessory industry.

**REQUEST NO. 19:** Admit that because of ePartners' limited experience in the fashion and fashion accessory industry, the parties agreed that ePartners would hire a fashion and fashion accessories subject matter expert as a member of its project team.

**REQUEST NO. 20:** Admit that GMA recommended that ePartners hire Farruk Hawan as the fashion and fashion accessories subject matter expert of its project team.

**REQUEST NO. 21:** Admit that GMA recommended that ePartners hire Maria Urdinarrain as the fashion and fashion accessories subject matter expert of its project team.

**REQUEST NO. 22:** Admit that ePartners hired and retained Maria Udrinarrain as the fashion and fashion accessories subject matter expert of its project team.

**REQUEST NO. 23:** Admit that before executing the Agreements, GMA's selection of Axapta as the underlying software for the project, independent of ePartners and based on its own independent due diligence, which GMA represented in the Purchase Order.

**REQUEST NO. 24:** Admit that before executing the Agreements, GMA's selection of Axapta as the underlying software for the project because, among other things, it was scalable enough to offer GMA and ePartners the possibility to sell rights for the use of the completed, customized product to others in the fashion and fashion accessory industry.

**REQUEST NO. 25:** Admit that before executing the Agreements, GMA's selection of Axapta as the underlying software for the project because, among other things, it was scalable enough to offer GMA the possibility to sell rights for the use of the completed, customized product to others in the fashion and fashion accessory industry.

**REQUEST NO. 26:** Admit that before executing the Agreements, GMA's selection of Axapta as the underlying software for the project because, among other things, it was scalable enough to offer ePartners the possibility to sell rights for the use of the completed, customized product to others in the fashion and fashion accessory industry.

**REQUEST NO. 27:** Admit that before executing the Agreements, GMA's selection of Axapta as the underlying software for the project because, among other things, it was flexible enough to offer GMA and ePartners the possibility to sell rights for the use of the completed, customized product to others in the fashion and fashion accessory industry.

**REQUEST NO. 28:** Admit that before executing the Agreements, GMA's selection of Axapta as the underlying software for the project because, among other things, it was flexible enough to offer GMA the possibility to sell rights for the use of the completed, customized product to others in the fashion and fashion accessory industry.

**REQUEST NO. 29:** Admit that before executing the Agreements, GMA's selection of Axapta as the underlying software for the project because, among other things, it was flexible enough to offer ePartners the possibility to sell rights for the use of the completed, customized product to others in the fashion and fashion accessory industry.

**REQUEST NO. 30:** Admit that before executing the Agreements, GMA's selection of certain additional software modules sold by an Australian MBS partner to be used with the Axapta software for the project independent of ePartners and based on its own independent due diligence, which GMA represented in the Purchase Order.

**REQUEST NO. 31:** Admit that GMA understood that the Axapta project, for which it would be partnered with ePartners, was to be a long-term project that would require an implementation period as much as or more than a year.

**REQUEST NO. 32:** Admit that Erik Sevenants informed George Altirs on or about October 12, 2004 that the Axapta project, for which it partnered with ePartners, was a long-term project that would require an implementation period as much as or more than a year.

**REQUEST NO. 33:** Admit that Erik Sevenants informed Bill Maloof on or about October 12, 2004 that the Axapta project, for which it partnered with ePartners, was a long-term project that would require an implementation period as much as or more than a year.

**REQUEST NO. 34:** Admit that GMA sought discounts from ePartners on the Axapta software pricing in exchange for an agreement that George Altirs would represent ePartners to other companies in the fashion and fashion accessory industry in order that ePartners would sell the rights to use the completed, customized product to others in the fashion and fashion accessory industry.

**REQUEST NO. 35:** Admit that GMA sought discounts from ePartners on the Axapta software pricing in exchange for an agreement that George Altirs would introduce ePartners to other companies in the fashion and fashion accessory industry in order that ePartners would sell the rights to use the completed, customized product to others in the fashion and fashion accessory industry.

**REQUEST NO. 36:** Admit that GMA sought discounts from ePartners on the Axapta software pricing in exchange for an agreement that George Altirs would solicit to other companies in the fashion and fashion accessory industry in order that ePartners would sell the rights to use the completed, customized product to others in the fashion and fashion accessory industry.

**REQUEST NO. 37:** Admit that GMA sought discounts from ePartners on consulting services for the Axapta customization project in exchange for an agreement that George Altirs would assist ePartners in selling the rights to use the completed, customized product to others in the fashion and fashion accessory industry.

**REQUEST NO. 38:** Admit that GMA sought discounts from ePartners on consulting services for the Axapta customization project in exchange for an agreement that George Altirs would represent ePartners in selling the rights to use the completed, customized product to others in the fashion and fashion accessory industry.

**REQUEST NO. 39:** Admit that GMA sought discounts from ePartners on consulting services for the Axapta customization project in exchange for an agreement that George Altirs would solicit to others to sell the rights to use the completed, customized product in the fashion and fashion accessory industry.

**REQUEST NO. 40:** Admit that ePartners offered, and GMA accepted, discounts on software and software consulting services.

**REQUEST NO. 41:** Admit that GMA failed to refer ePartners to any potential customers, pursuant to the Joint Marketing Agreement.

**REQUEST NO. 42:** Admit that GMA failed to represent ePartners to any potential customers, pursuant to the Joint Marketing Agreement.

**REQUEST NO. 43:** Admit that GMA failed to introduce ePartners to any potential customers, pursuant to the Joint Marketing Agreement.

**REQUEST NO. 44:** Admit that GMA failed to solicit to other companies as potential customers, pursuant to the Joint Marketing Agreement

**REQUEST NO. 45:** Admit that, per the Joint Marketing Agreement ("JMA"), GMA was to appoint appropriate team personnel to support the Joint Marketing agreement, namely, a sales account representative, marketing liaison and executive sponsor.

**REQUEST NO. 46:** Admit that GMA failed to appoint the appropriate team personnel to support the Joint Marketing agreement, namely, a sales account representative, marketing liaison and executive sponsor.

**REQUEST NO. 47:** Admit that, per the JMA, GMA was to create a list of the most relevant trade-shows and events where both parties would showcase their marketing alliance.

**REQUEST NO. 48:** Admit that GMA failed to create a list of the most relevant trade-shows and events where both parties would showcase their marketing alliance, per the JMA.

**REQUEST NO. 49:** Admit that GMA failed to invite ePartners to its next trade show or similar event that GMA would participate in, per the JMA.

**REQUEST NO. 50:** Admit that, per the JMA, GMA was to develop an action plan for a joint road show for 2006.

**REQUEST NO. 51:** Admit that GMA failed to develop an action plan for a joint road show for 2006, per the JMA.

**REQUEST NO. 52:** Admit that, per the JMA, GMA was to participate in quarterly pipeline review conference calls.

**REQUEST NO. 53:** Admit that GMA failed to participate in quarterly pipeline review conference calls, per the JMA.

**REQUEST NO. 54:** Admit that, per the JMA, GMA was to provide reporting of results against mutually agreed upon targets.

**REQUEST NO. 55:** Admit that GMA failed to provide reporting of results against mutually agreed upon targets, per the JMA.

**REQUEST NO. 56:** Admit that, per the JMA, GMA was to mutually author and issue a white paper documents.

**REQUEST NO. 57:** Admit that GMA failed to mutually author and issue a white paper documents, per the JMA.

**REQUEST NO. 58:** Admit that, per the JMA, GMA was to not disclose the confidential information of ePartners.

**REQUEST NO. 59:** Admit that GMA has disclosed the confidential information of ePartners.

**REQUEST NO. 60:** Admit that, per the Master Services Agreement ("MSA"), GMA was to assign a Project Manager for delivery of the project (MSA para. 7.1).

**REQUEST NO. 61:** Admit that, per the MSA, GMA was to support the project and manage the schedule to minimize unproductive activities (MSA para. 7.2).

**REQUEST NO. 62:** Admit that GMA failed to support the project and manage the schedule to minimize unproductive activities.

**REQUEST NO. 63:** Admit that, per the MSA, GMA was to provide a dedicated core team to cover all modules and sub-modules affect by the services of the parties' Service Order (MSA para. 7.3).

**REQUEST NO. 64:** Admit that GMA failed to provide a dedicated core team to cover all modules and sub-modules affect by the services of the parties' Service Order.

**REQUEST NO. 65:** Admit that, per the MSA, GMA was to make sure that the GMA dedicated team and project management has the authority and support to define, decide and modify existing business processes to achieve greater organizational efficiency and to reduce the cost of system implementation and ongoing support (MSA para. 7.4).

**REQUEST NO. 66:** Admit that GMA failed to make sure that the GMA dedicated team and project management had the authority and support to define, decide and modify existing business processes to achieve greater organizational efficiency and to reduce the cost of system implementation and ongoing support.

**REQUEST NO. 67:** Admit that, per the MSA, GMA was to recognize that delays in making decisions relative to the internal processes, project, objectives, and system configuration may extend the target dates and costs associated with the implementation (MSA para. 7.5).

**REQUEST NO. 68:** Admit that GMA failed to recognize that delays in making decisions relative to the internal processes, project, objectives, and system configuration may extend the target dates and costs associated with the implementation.

**REQUEST NO. 69:** Admit that, per the MSA, GMA was to assume responsibility for providing ePartners written notification regarding any unsatisfactory ePartners personnel (MSA para. 7.6).

**REQUEST NO. 70:** Admit that GMA did not provide ePartners written notification regarding any and all unsatisfactory ePartners personnel.

**REQUEST NO. 71:** Admit that, per the MSA, test plans for system/integration and user acceptance testing would be prepared by GMA with ePartners' assistance (MSA para. 7.7).

**REQUEST NO. 72:** Admit that GMA failed to prepare test plans for system/integration and user acceptance.

**REQUEST NO. 73:** Admit that, per the MSA, GMA's technical resources were to be responsible to prepare, validate and map all legacy data for the new system (MSA para. 7.8).

**REQUEST NO. 74:** Admit that GMA's technical resources failed to prepare, validate and map all legacy data for the new system.

**REQUEST NO. 75:** Admit that, per the MSA, GMA was responsible to provide a technological and processing environment conductive to supporting the system selected by

GMA, both during the implementation and subsequent to the implementation, and in accordance with such specifications as recommended by the software publisher and ePartners (MSA para. 7.9)

**REQUEST NO. 76:** Admit that GMA failed to provide a technological and processing environment conductive to supporting the system selected by GMA, both during the implementation and subsequent to the implementation, and in accordance with such specifications as recommended by the software publisher and ePartners.

**REQUEST NO. 77:** Admit that GMA was to provide a Microsoft Sharepoint environment to support project collaboration (MSA para. 7.9).

**REQUEST NO. 78:** Admit that GMA failed to provide a Microsoft Sharepoint environment to support project collaboration.

**REQUEST NO. 79:** Admit that, per the MSA, GMA was to dedicate person(s) from its implementation team to be present at "go-live" (MSA para. 7.10).

**REQUEST NO. 80:** Admit that GMA failed to dedicate person(s) from its implementation team to be present at "go-live."

**REQUEST NO. 81:** Admit that Capelli would present a number of qualified subject matter expert candidates for consideration (MSA para. 7.11).

**REQUEST NO. 82:** Admit that Capelli failed to present a number of qualified subject matter expert candidates for consideration.

**REQUEST NO. 83:** Admit that George Altirs agreed to assist ePartners in selling the rights to use the completed, customized product to others in the fashion and fashion accessory industry, and represented as much in the Joint Marketing Agreement.

**REQUEST NO. 84:** Admit that George Altirs failed to assist ePartners in selling the rights to use the completed, customized product to others in the fashion and fashion accessory industry.

**REQUEST NO. 85:** Admit that George Altirs agreed to represent ePartners in selling the rights to use the completed, customized product to others in the fashion and fashion accessory industry, and represented as much in the Joint Marketing Agreement.

**REQUEST NO. 86:** Admit that George Altirs failed to represent ePartners in selling the rights to use the completed, customized product to others in the fashion and fashion accessory industry.

**REQUEST NO. 87:** Admit that George Altirs agreed to introduce ePartners to others in the fashion and fashion accessory industry, and represented as much in the Joint Marketing Agreement.

**REQUEST NO. 88:** Admit that George Altirs failed to introduce ePartners to others in the fashion and fashion accessory industry.

**REQUEST NO. 89:** Admit that George Altirs agreed to solicit to others to sell the rights to use the completed, customized product to others in the fashion and fashion accessory industry, and represented as much in the Joint Marketing Agreement.

**REQUEST NO. 90:** Admit that George Altirs failed to solicit to others to sell the rights to use the completed, customized product to others in the fashion and fashion accessory industry.

**REQUEST NO. 91:** Admit that during negotiations with ePartners prior to the execution of the Joint Marketing, George Altirs and GMA threatened to partner with another software development and implementation company should ePartners fail to succumb to their demand for discounts on software consulting services and software pricing.

**REQUEST NO. 92:** Admit that during negotiations with ePartners prior to the execution of the Joint Marketing, George Altirs represented to ePartners that he controlled the Aria software and could cause Aria users to buy the rights to use the completed, customized Axapta product for which GMA and ePartners partnered.

**REQUEST NO. 93:** Admit that during negotiations with ePartners prior to the execution of the Joint Marketing, George Altirs represented to ePartners that ePartners would make future profits by licensing or otherwise selling the rights to use the completed, customized Axapta product for which GMA and ePartners partnered.

**REQUEST NO. 94:** Admit that during negotiations with ePartners prior to the execution of the Joint Marketing, George Altirs represented to ePartners that ePartners would make more than $10 million in future profits by licensing or otherwise selling the rights to use the completed, customized Axapta product for which GMA and ePartners partnered.

**REQUEST NO. 95:** Admit that prior to the execution of the Joint Marketing Agreement, GMA anticipated future profits as the result of referral fees under the Joint Marketing Agreement.

**REQUEST NO. 96:** Admit that ePartners disclosed to GMA that there is often dissatisfaction among users during implementation because of the learning curve associated with learning a new system and the discomfort of change in general.

**REQUEST NO. 97:** Admit that there were other business dealings by George Altirs, GMA and/or Capelli that were not successfully completed in the 10 years prior to and since the execution of the contracts/agreements made the basis of the present lawsuit.

**REQUEST NO. 98:** Admit that GMA has a relationship and arrangement between it and another software partner(s) subsequent to ePartners' relationship with GMA.

**REQUEST NO. 99:** Admit that George Altirs owns Aria.

**REQUEST NO. 100:** Admit that Aria's registered users continue to utilize it.

**REQUEST NO. 101:** Admit that Aria's registered users continue to pay for its use.

**REQUEST NO. 102:** Admit that since GMA notified ePartners that it no longer wished to partner with ePartners under the Joint Marketing Agreement and/or Master Services Agreement, it or George Altirs has made a profit on the Aria software or any new software it has implemented with similar functionality.

**REQUEST NO. 103:** Admit that GMA and/or any software partner it has work with since notifying ePartners that it no longer wished to partner with ePartners under the Joint Marketing Agreement and/or Master Services Agreement have used all or part of the software design developed and/or proposed by ePartners to GMA.

Dated: New York, New York
April 18, 2008

                Respectfully submitted,

                HERMES SARGENT BATES, LLP

                By: _____
                   Amy E. Davis, *pro hac vice*
                   Anthony H. Lowenberg, *pro hac vice*

                901 Main Street, Suite 5200
                Dallas, Texas 75202
                (214) 749-6000
                (214) 749-6100 fax

                -and-

                Thelen Reid Brown Raysman & Steiner LLP
                Peter Brown
                W. Shamiso Kristen-Faith Maswoswe
                875 Third Avenue
                New York, NY 10022
                (212) 603-2000

                Attorneys for Defendant ePartners Incorporated

### CERTIFICATE OF SERVICE

The undersigned certifies that on the 18th day of April 2008, a true and correct copy of the foregoing document was forwarded in accordance with the Federal Rules of Civil Procedure and the Local Rules of the Southern District of New York to following counsel of record:

John P. Bostany
Ronald Paltrowitz
Jessica Claus
The Bostany Law Firm
40 Wall Street, 61st Floor
New York, NY 10008

                                          _____
                                          ANTHONY H. LOWENBERG