06/10/2005 FRI 12:28 FAX                                                        ☒007/027



## JOINT MARKETING AGREEMENT BETWEEN
## EPARTNERS INCORPORATED AND GMA ACCESSORIES, INC.

THIS JOINT MARKETING AGREEMENT ("Agreement") is made effective as of June 8, 2005 (the "Effective Date"), between GMA Accessories, Inc., a New York corporation ("GMA"), with its principal place of business located at 245 Secaucus Road, Secaucus, New Jersey, 07094 and ePartners Incorporated, a Texas corporation ("ePartners"), with its principal place of business located at 1304 W. Walnut Hill Lane, Suite 300, Irving, Texas 75038.

1. **PURPOSE**

    a. ePartners is an international information technology solutions provider, software developer, and reseller of certain third party software applications (including, without limitation, Microsoft Business Solutions).

    b. GMA is an industry leader within the Fashion and Apparel Industry ("F&A") who designs, manufactures and markets private label and branded products.

    c. The purpose of this Agreement is to establish the terms and conditions under which GMA and ePartners will work with each other from time to time to provide Software and/or Consulting Services (collectively, the "Services") to their respective customers, prospective customers, and industry contacts.

2. **DEFINITIONS**

    a. *"Confidential Information"* means the disclosing party's business, technical or financial data, information, processes and trade secrets, proprietary tools, research, development and business activities, whether in written, oral, or other form, including but not limited to, methods of doing business, and names of customers or Customers of such party, which are treated or identified as confidential or proprietary by such party or the disclosure of which might reasonably be construed to be contrary to the interest of such party and all the terms and provisions of this Agreement.

    b. *"Consulting Services"* means the provision of technical assessment and consulting services including, without limitation, enterprise resource planning and system integration services.

    c. *"Fees"* mean amounts payable as commissions by ePartners to GMA as further described in Section 5, Commission, and Section 6, Sales and Marketing.


EXHIBIT E

d.  *"Program Manager"* means the primary point of contact designated by a party for dealing with the other party under this Agreement, which point of contact has the authority to make decisions with respect to actions to be taken by such party hereunder.

e.  *"Software"* means the provision of certain software to qualifying customers by ePartners.

f.  *"Intellectual Property"* ("IP") means the unique and distinct software customizations and/or business processes developed and documented specifically for GMA in the development and implementation of its information technology solution.

g.  *"Fashion and Apparel"* ("F&A") means the product lines and product types in which GMA is actively engaged as of the Effective Date and include apparel, home accessories/décor, novelty gift, footwear, accessories, accessory furniture, cosmetics re-packaging, bath and body products, and sleepwear.

3.  **TERM OF AGREEMENT**

The term of this Agreement shall commence on the date first set forth above (the "Effective Date"), and shall continue in effect, unless terminated as provided herein, until two (2) years after the last invoice date for product or services purchased by GMA (*a.k.a.* Capelli) from ePartners.

Unless otherwise provided herein, upon expiration of this Agreement as provided above: (a) ePartners shall continue to pay in accordance with the provisions of this Agreement all amounts payable to GMA as commissions earned prior to the date of termination or expiration; and (b) each party shall return or destroy, at the direction of the other party, all the other party's Confidential Information in its possession.

Further, this Agreement shall automatically terminate in the event that five (5) referrals are not provided pursuant to the terms set forth herein within four (4) years from the Effective Date of this Agreement.

Notwithstanding the foregoing, if this Agreement is terminated for cause, ePartners may, in its sole discretion, immediately cease paying to GMA any commissions provided for hereunder.

4.  **RELATIONSHIP AND REPRESENTATION**

In its normal course of business, GMA comes into contact with businesses that could benefit from using the products and services provided by ePartners. GMA, as an independent contractor, will represent certain products and services of ePartners to its customers, prospective customers, and industry contacts.

5. COMMISSION — ePartners will pay to GMA a commission anytime a sales or performance of services, fall under any of the following categories.

   a. <u>Commission Percentage.</u>

   ePartners will pay to GMA a commission of ten percent (10%) of the license fees (excluding maintenance and support) for software sales and related Services delivered by ePartners or its sub-contractors during the twenty-four (24) months from the initial transaction resulting from referrals from GMA. Commissions are available for properly registered referrals in F&A industry which result in a closed transaction within two (2) years from the date referral was accepted by ePartners.

   Or

   ePartners will pay to GMA a commission of ten percent (10%) of the license fees (excluding maintenance and support) for software sales and related Services delivered by ePartners or its sub-contractors during the twenty-four (24) months from the initial transaction resulting from referrals from GMA that utilize the IP developed by ePartners and GMA through its association with GMA. Commissions are available for properly registered referrals in non-F&A industries which result in a closed transaction within two (2) years from the date referral was accepted by ePartners.

   Or

   ePartners shall pay to GMA a five percent (5%) commission of the license fees (excluding maintenance and support) and Services in the F&A industry for software sales not covered under referral. GMA shall, if asked by ePartners, provide a client reference, for a period of 10 (ten) years from the effective date.

   Or

   ePartners shall pay to GMA a five percent (5%) commission of the initial license fees (excluding maintenance and support) in any non-F&A industry for software sales covered under referral requirements established in Exhibit 1.

   Or

   Payment of commissions will be as set forth in Section 9, <u>Reporting:Payment.</u>

   The parties agree that no commissions shall be due to GMA for the first two referral transactions closed pursuant to this Agreement.

   The commissions set forth in this agreement applies to any domestic (United States) or International referral or assistance in ePartners sales cycle, as detailed above.

For purposes of this Agreement, the following terms shall have the meaning set forth below.

A *"referral"* is a customer which purchases Microsoft Business Solutions software from ePartners as a result of GMA's independent marketing activities. Such GMA developed referrals would be specific in nature, including without limitation, identification of the appropriate department information, business issue requiring a software or services solution, and executive and/or ownership contacts. Such referrals shall be submitted and qualified in accordance with the procedures set forth in Exhibit 1, attached hereto and incorporated by this reference. Once a prospect has been registered and qualified, such lead will be deemed a "referral".

6. **SALES AND MARKETING**

   a. <u>Sales and Marketing Documents</u>. ePartners will develop and provide to GMA, at no charge, a sales kit for marketing related to the Microsoft Business Solutions applications (including the F&A adaptation of the same) and ePartners general business information. The sales kit will include, without limitation, communication process for new sales, sales methodology, and various sales templates. ePartners shall utilize commercially reasonable efforts to have the sales kit completed within one hundred twenty (120) days from the Effective Date.

   b. <u>Planning and Strategy Meeting</u>: Within ninety (90) days of the execution of this Agreement, the parties agree to organize a 2-day off site meeting for key executives, managers and subject matter experts. The end result of this kick off meeting will be the initial draft of the sales and marketing plan and a mutually agreed business plan with strategic goals and tactical objectives and will include budgets and resource allocation. The parties will use reasonable efforts to secure attendance at this meeting by representatives from Microsoft. Each Party shall bear its own cost for its participation at this event. The parties will mutually agree in advance how to handle expenses related to any participants from Microsoft.

   c. <u>Industry Trade-Shows</u>. GMA will provide ePartners a list of the most relevant trade-shows and events where both parties may showcase the marketing alliance between the parties. GMA agrees that ePartners will be invited to attend the next trade show or similar event that GMA is participating. The Program Manager for each party shall be responsible organizing the logistics related to all aspects of planning and participation at the events. The parties will utilize its relationships with certain public relation firms to obtain speaking opportunities for GMA at these industry specific events.

   d. <u>Road Show</u>. The parties agrees to develop an action plan for a joint road show for 2006. The parties agrees to use reasonable efforts to develop a format for the road show plan that can be utilized as a template for various geographic areas

and countries. GMA and ePartners will identify the most appropriate markets/regions for the road show events.

e. <u>Marketing Funds</u>. ePartners agrees to provide $100,000.00 of marketing funds to support and promote the marketing relationship established herein. The allocation of funds for marketing shall be in the sole discretion of ePartners.

f. <u>Solution Resources</u>. ePartners agrees to hire one (1) full time equivalent employee (a "Subject Matter Expert" or "SME") to assist in the management of this joint marketing relationship and to support the development of the proposed solution and related collateral materials. GMA agrees to provide adequate resources and time to assist ePartners in locating and qualifying potential candidates for this SME position. ePartners anticipates that the annual salary plus performance incentives of hiring such an individual will be approximately $150,000.00 per annum. All such costs of employment of the SME shall be borne by ePartners.

7. **MUTUAL OBLIGATIONS AND RESPONISBILITES**

   a. <u>Team Personnel</u>. Each Party will appoint the following positions in relation to, and in support of, the Agreement. The party will name a different individual for each designated position. Each party will be responsible for the respective Party's execution against a mutually agreed upon Marketing Plan (the "Marketing Plan").

   (i) Sales Account Representative
   (ii) Marketing Liaison
   (iii) Executive Sponsor

   b. <u>Solution "Productizing"</u>. Except as otherwise provided herein, ePartners will utilize commercially reasonable efforts to provide adequate engineering, marketing, and selling resources as may be required to finalize and complete the proposed solution in a "productized" manner to provide for sell to the general public. For purposes of this Agreement, "productized" shall mean that the solutions has been developed, tested and documented in accordance with industry standards for development of such software applications.

   c. <u>Reporting and Communications</u>.

   (i) Both Parties agree to attend and participate in quarterly pipeline review conference calls. Furthermore, at least on a quarterly basis, team members will participate in an update on the status and progress of the Agreement. These calls will include the relationship managers for ePartners and GMA as well as the company representatives working on specific accounts.

   (ii) Both Parties will provide, at least quarterly, reporting of results against mutually agreed upon targets.

    d.    <u>White Paper</u>. On or before December 31, 2005, the Parties will mutually author and issue a white paper document describing the proposed solution and announcing the joint marketing efforts of the parties. Each party will provide appropriate resources to timely complete the development and publication of the solution white paper.

8. **CONTRACTING OBLIGATIONS**

Unless otherwise agreed in writing between the parties, ePartners will utilize its own contracting documents for the sell of any software licenses and professional services.

9. **REPORTING; PAYMENT**

No later than the 20th day of each month following a quarter end reporting period for ePartners, ePartners will pay to GMA all Fees due hereunder. No Fees shall be due hereunder until ePartners has received full payment for the applicable software licenses related to the referral and or ePartners has received cash payment related to the applicable qualifying Services invoices. At the same time, ePartners will provide a written report detailing collected software licenses revenues from referrals by customer for the previous quarter. The payments will be directed to the Accounts Receivable Department at GMA, and the reports will be directed to the receiving party's Program Manager.

10. **AUDIT**

Upon thirty (30) days prior written notice from a party (the "requesting party"), the other party agrees to allow the requesting party to inspect and audit, during normal business hours, all of a party's records solely related to that party's payments of the Fees to the requesting party under this Agreement. In the event that the requesting party requests a record from the other party during an audit which contains information not solely related to this Agreement, that party shall remove such unrelated information and provide the redacted record to the requesting party. The right to audit shall be limited to validating the party's records of the payments made by the party to the requesting party. Such audits may not be conducted more than once in each six (6) month period following the Effective Date of this Agreement. The cost of the audits shall be borne by the requesting party unless it is determined that payments made by the party to the requesting party are five percent (5%) or more lower than payments due, in which case the cost of the audit shall be borne by the party subject to audit. The party shall pay the requesting party any unpaid amounts with interest at the rate of two percent (2%) above the then-applicable Prime Rate as quoted in the "Money Rates" column of the Wall Street Journal, from the date such payments became due. If audit results show the party paid an excessive amount by mistake, the requesting party will promptly refund the specified excessive amount.

11. **LIABILITIES AND INDEMNIFICATION**

   a. GMA AND EPARTNERS MAKE NO WARRANTY OR REPRESENTATION, EITHER EXPRESS OR IMPLIED, WITH RESPECT TO ANY SERVICES OR DELIVERABLES PROVIDED HEREUNDER, INCLUDING THEIR QUALITY, PERFORMANCE, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE.

   b. NEITHER PARTY SHALL BE LIABLE FOR (i) SPECIAL, INDIRECT, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, INCLUDING, WITHOUT LIMITATION, ANY SUCH DAMAGES RESULTING FROM THE PROVISION OF SERVICES HEREUNDER, THE USE OR INABILITY TO USE ANY DELIVERABLE OR ANY COMPUTER OR COMPUTER SYSTEM, OR THE LOSS OF DATA, SAVINGS, PROFITS, INCOME, BUSINESS OR GOODWILL, WHETHER OR NOT SUCH PARTY IS ADVISED OR IS AWARE OF THE POSSIBLITY OF SUCH DAMAGES; OR (ii) ANY CLAIM THAT AROSE MORE THAN TWO YEARS PRIOR TO THE INSTITUTION OF SUIT THEREON. In no event shall either party be liable for monetary damages for any matter relating to or arising in connection with this Agreement in excess of an amount equal to the aggregate amount of Fees payable hereunder in the 12-month period immediately preceding the events giving rise to the liability.

   c. Subject to the limitation of liability set forth in this Section 11, each party shall indemnify, defend and hold harmless the other party and its respective officers, employees and agents from and against any claim, suit or proceeding, and pay any damages awarded by a court of final jurisdiction, for third party claims arising out of such party's material breach of this Agreement or its negligence in connection with its performance of its obligations under this Agreement. Each indemnified party agrees to (i) promptly notify the indemnifying party in writing upon becoming aware of any such claim, (ii) allow the indemnifying party sole control over the defense of such claim, and (iii) cooperate, as reasonably requested, by the indemnifying party, in the defense of such claim.

   d. THE LIMITATIONS PROVISIONS OF SECTION 11(b) SHALL NOT APPLY TO ANY CLAIM OR ACTION, THREATENED OR PENDING, ARISING UNDER SECTION 11(c) (INDEMNIFICATION) OR SECTION 13 (CONFIDENTIALITY) HEREUNDER.

12. **NON-SOLICITATION**

During the Term of this Agreement and for one year thereafter, neither party or its affiliates shall solicit to hire or hire any employee of the other, who has been directly involved in providing Sales or Services support or in assisting in the completion of such Services, without the express written consent of the other party. In the event of a breach of the foregoing by a party hereto, the parties agree that a reasonable estimate of the damages to the other party for each violation shall be an amount equal to forty percent (40%) of the first year salary (including signing or other guaranteed bonus) to

be paid by the employer to the person hired. The breaching party will immediately pay such amount to the non-breaching party upon demand. The parties agree that such amount shall not constitute a penalty or fine and waive any right, to the extent permitted by law, to contest the liquidated damages provided hereunder. Generalized searches and solicitations, whether placed in a newspaper, online or otherwise, shall not be deemed to be prohibited solicitations by this Section 8.

13. **CONFIDENTIAL INFORMATION**

    a. Neither party shall disclose Confidential Information of the other party. The receiving party shall use the same degree of care as it uses to protect its own confidential information of like nature but no less than a reasonable degree of care to maintain the Confidential Information of the disclosing party. The parties agree that Confidential Information shall include the terms and conditions of this Agreement.

    b. Upon the written request of either party or the termination of the Agreement for any reason, each receiving party agrees to deliver forthwith to the disclosing party all documents, records, tools and other materials relating to the business of the disclosing party or its affiliates (and all copies thereof) that the receiving party may have obtained in the course of providing Services under this Agreement and all material and information that is the property of the disclosing party or its affiliates, or certify to the destruction thereof.

    c. The foregoing shall not prevent either party from disclosing information which: (i) becomes publicly available other than as a result of a disclosure by the receiving party or by its employees, agents, or other persons to whom the receiving party has disclosed such information; (ii) was available to receiving party on a non-confidential basis prior to its disclosure by receiving party by the other party provided that such prior disclosure and its non-confidential status are evidenced in writing; (iii) becomes available to the receiving party on a non-confidential basis from a source other than the other party hereto, provided that such source is not bound by a confidentiality agreement with the other party hereto; or (iv) was independently developed by a party without access to the Confidential Information.

    d. Both parties acknowledge that any use or disclosure of the other party's Confidential Information in a manner inconsistent with the provisions of this Agreement may cause the non-disclosing party irreparable damage for which remedies other than injunctive relief may be inadequate.

    e. A party may disclose the terms of this Agreement to their paid business or legal advisors or consultants, the Internal Revenue Service, any state or local taxing authorities, or upon order of a court of competent jurisdiction. No disclosure to any third party, who could use the information against the non-disclosing party to this Agreement, shall be made without either first obtaining the non-disclosing party's written consent prior to the disclosure or receiving of an order of a court of competent jurisdiction requiring such disclosure.

14. **TERMINATION**

   a. ~~This Agreement shall be effective as of the Effective Date and shall continue in full force and effect for a period of ten (10) years unless terminated in accordance with the provisions herein or unless terminated by mutual agreement of the parties.~~ [handwritten: WM]

   b. ePartners may terminate this Agreement in its sole discretion in the event that GMA fails to provide five (5) referrals within the first forty-eight (48) months from the Effective Date of this Agreement. Upon any such termination by ePartners of this Agreement for failure to provide the five (5) referrals, any commissions accruing to GMA shall immediately cease and ePartners shall owe no further payments to GMA hereunder.

   c. Either party shall have the right to terminate this Agreement immediately upon written notice if the other party hereto:

      i. breaches any material obligation under this Agreement and does not cure the same to the reasonable satisfaction of the other party within ten (10) days after written notice of such breach;

      ii. fails to comply with any material requirement of this Agreement as to confidentiality or proprietary nature of any material covered hereby or provided hereunder; or

      iii. becomes insolvent or bankrupt however evidenced.

   d. The provisions of this Agreement regarding indemnification and confidentiality of information shall not be affected by and shall survive the termination of this Agreement.

15. **NOTICES**

   a. Any notice required or permitted to be given to either party pursuant to this Agreement shall be sufficiently given if sent by a nationally recognized overnight courier or by registered or certified mail, return receipt requested, postage prepaid, addressed to the address first above given or such other address as the party shall designate by notice to the other party.

   b. Any notice to be given to ePartners pursuant to this Agreement shall be addressed to:

> ePartners, Incorporated
> 1304 W. Walnut Hill Lane, Suite 300
> Irving, Texas 75038
> Attention: Ken Eldridge, Executive Vice President of Sales
> Facsimile: 972-550-8454

> Any notice to be given to GMA pursuant to this Agreement shall be addressed to:

> GMA Accessories, Inc.
> 1 East 33rd Street, 9th Floor
> New York, NY 10016
> Attention: William Maloof, Chief Financial Officer

16. **INDEPENDENT CONTRACTORS; TAXES**

    a. Notwithstanding any terms used herein, the parties to this Agreement acknowledge that they are independent contractors and neither party is an employee, agent, partner or joint venturer of the other nor shall it represent itself as such to any third parties. Neither party shall have the right to bind the other to any agreement with a third party or to incur any obligation or liability on behalf of the other party. Each party shall be responsible for compliance with all laws, rules and regulations involving such party's employees, including, but not limited to, employment, hours of labor, working conditions, payment of wages, provision of employee benefits, and payment of taxes, such as unemployment, social security and other payroll taxes, including applicable contributions from such persons when required by law.

    b. Each party will be responsible for any applicable sales, use, withholding or other taxes in connection with Services it provides under this Agreement.

17. **GENERAL**

    a. Subject to Section 4.2 hereunder, the rights and obligations of the parties set forth in this Agreement are nonexclusive, and the parties shall have the right to enter into similar agreements with third parties. Nothing in this Agreement shall be deemed to create or impose any minimum volume requirements on either party.

    b. Neither party shall subcontract nor assign its obligations under this Agreement without the prior written consent of the other, which shall not be unreasonably delayed, conditioned or withheld.

    c. Each party agrees and covenants that in the event the other party incurs legal expenses to enforce the terms of this Agreement or to recover damages from the other party by reasons of such party's breach of the terms of this

Agreement, then, in addition to any other remedies or damages, the breaching party shall be responsible for the other party's reasonable legal fees and court costs in enforcing the terms of this Agreement or recovering damages for breach of the terms of this Agreement.

d.  The provisions of sections 2, 3, 5, 9, 10, 11, 12, 13, 15, 16 and 17 hereof shall survive any termination or expiration of this Agreement.

e.  This Agreement shall inure to the benefit and be binding upon the parties hereto and their respective heirs, executors, administrators, successors and permitted assigns.

f.  This Agreement shall be governed by and interpreted in accordance with the laws of the State of New York, without regard to the conflicts of law principles thereof. In the event of any dispute between the parties arising from or relating to this Agreement, the parties will attempt to resolve the dispute in good faith by mutual consultations. In the event that the dispute is not resolved and a party brings any claim or action against the other party arising out of this Agreement, such claim or action shall be brought in a court of competent jurisdiction.

g.  This Agreement constitutes the entire understanding between the parties related to the subject matter herein, and all prior or contemporaneous agreements, representations, statements, negotiations, and undertakings, whether oral or in writing, are superseded in their entirety by the provisions of this Agreement. This agreement may not be modified or amended except in a writing signed by both parties.

(Signature page follows.)

IN WITNESS WHEREOF of this Agreement has been duly executed by the parties to be effective as of the date first written above.

| GMA, Inc. | ePartners Incorporated |
|---|---|
| By: *[signature]* | By: *[signature]* |
| Name: WILLIAM MALOOF | Name: Ken Eldridge |
| Title: CFO | Title: Executive Vice President of Sales |

### Exhibit 1 – Qualified Referral

For a prospect to be considered a qualified referral, the following information must be provided by GMA to ePartners regarding such prospect.

- Name of Corporation
- Primary Corporate office location and location of operations
- Name of key Corporate and Operating Officers with contact information
- Revenue Size (estimated)
- Primary lines of business
- General information regarding Information Technology Systems deployed. (ex. Current ERP system, operating environment (Unix vs Windows), customized solutions, etc.)
- Major business issues to be addressed by a new software and/or Services offering/solution. These can be described as "pain points" of the existing systems ability to support the business.
- General budget range for new software and/or Services offering/solution.
- Timing of purchase of new software and/or Services offering/solution
- Primary decision maker(s) (ex. committee or individual)

Upon receipt of such information from GMA, ePartners shall verify such information through either an in-person meeting or conference call introduction with GMA and prospect personnel. Subsequent to such call and successful confirmation of the above referenced information, ePartners shall provide written confirmation to GMA that the Referral is registered.



Page 13